IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
March 2, 2021 Session

**CURTIS KELLER v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 10-02756     J. Robert Carter, Jr.,[1] Judge**

**No. W2020-00590-CCA-R3-PC**

The petitioner, Curtis Keller, appeals the denial of his petition for post-conviction relief, which petition challenged his convictions of especially aggravated kidnapping, aggravated robbery, attempted aggravated robbery, aggravated burglary, and evading arrest. In this appeal, the petitioner alleges that he was deprived of the effective assistance of trial and appellate counsel and that the post-conviction court erred by denying his motions for a continuance and to inspect grand jury materials. Discerning no error, we affirm the denial of post-conviction relief.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which TIMOTHY L. EASTER, and J. ROSS DYER, JJ., joined.

Lance R. Chism, Memphis, Tennessee, for the appellant, Curtis Keller.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case arose from a June 2008 home invasion in Germantown, for which the petitioner was convicted of three counts of especially aggravated kidnapping, three counts of aggravated robbery, four counts of attempted aggravated robbery, one count of aggravated burglary, and one count of evading arrest. *State v. Curtis Keller*, No. W2012-01457-CCA-R3-CD, slip op. at 1 (Tenn. Crim. App. Jackson, Sept. 29, 2014) (*Keller I*).

---

[1]     Judge Chris Craft recused himself upon the petitioner's motion, and the case was transferred to Judge Carolyn Blackett, who later recused herself. The case was then transferred to Judge J. Robert Carter, Jr., who presided over the evidentiary hearing.

The petitioner received an effective 300-year sentence. *Id.* This court affirmed the petitioner's convictions on direct appeal, and, after remand by our supreme court to reconsider the case in light of recent opinions, this court again affirmed the petitioner's convictions. *Id.* This court summarized the evidence at trial:

> The crimes for which the [petitioner] stands convicted arose out of a home invasion robbery at the Chan home in Memphis. Although the [petitioner] was not physically present at the home, he was the mastermind behind the planning and organization of the event. As such, he was convicted of the crimes under a theory of criminal responsibility.

> On June 12, 2008, Mom Houon and Thourn Chan lived in a three story home, and Jeffrey Land, Sr. and his daughter, Claire Land, were living with them. Two of the Chan's children, Naree and Dara, were also home from college for the summer, as was Jeffrey Land, Jr. Mom Houon and Thourn Chan shared the master bedroom located on the first floor. The other occupants had their own rooms on the second or third floors of the home.

> Around three o'clock in the morning, Mom Houson [sic] was awakened by the sound of glass breaking in the home. Thourn, her husband, went to the adjacent exercise room where he believed the sound had come from and was confronted by "a bunch" of masked men in dark colored clothing. The men aimed flashlights in his face and identified themselves as police officers. Mr. Chan was handcuffed and "dragged" back into the bedroom where his wife remained. Although the bedroom was dark, Mom Houson [sic] could see that several people, armed with guns, had entered the bedroom. The men handcuffed Mom Houson [sic], pointed guns at the couple, and ordered them to lie face-down on the floor. Some of the men left the room to secure the other occupants of the home.

> Dara Chan was awakened by the sound of heavy footsteps and banging doors. He heard someone yell "Germantown Police." He and his sister Naree Chan peered out the doors of their respective rooms to see what was wrong. Naree Chen [sic] was able to place a call to 911. A large African-American man wearing a ski mask and gloves forced

his way into Dara Chan's bedroom, pointed a gun at his head, and demanded to know where the money was. A second man entered the bedroom and began searching for valuables while the first man held him at gunpoint. After the search, the man grabbed Dara Chan by the back of the neck, aimed the gun at him, and dragged him down the stairs towards his parent's bedroom. As he went, he heard his sister Naree screaming inside her own bedroom. One of the men had seen Naree Chan on the phone and had taken her phone, throwing it on the floor. Dara Chan was handcuffed and ordered to lie on the floor in his parents [sic] bedroom.

Jeffery Land, Jr. was also awakened by someone pulling his arms and forcibly removing him from the bed. Initially, he was able to put the man in a headlock, but another man entered the room, subdued him, and placed him in handcuffs. These men also identified themselves as "Germantown Police." The men pointed a gun at Jeffrey Land, Jr.'s head, and he informed the men his wallet was inside the dresser. After the men retrieved his wallet, he was then forced out of his bedroom and taken down the stairs to the master bedroom with the others where they all remained at gunpoint until the intruders left.

Jeffrey Land, Sr. was awakened by men shining a light in his face and identifying themselves as "FBI." While lying in his bed, he was handcuffed with his hands in front of him. Thereafter, he was jerked from the bed and taken to the master bedroom at gunpoint. Jeffrey Land, Sr. heard his daughter, Claire Land, crying, and he heard someone yell at her to shut up or that he would kill her. She, as were all the other occupants of the house, was handcuffed and placed on the floor in the master bedroom at gunpoint.

The intruders repeatedly asked Thourn Chan, the owner of three jewelry and pawn shops, the location of the safe and the jewelry. He begged the men not to harm his family and offered to take them to the jewelry store. The intruders slammed him to the floor. Upon learning from him that there was not a safe in the home, the intruders ransacked the other rooms of the home and took $5,000 from Mom Houon's purse which was located in the hallway. They also took Thourn

Chan's Cartier watch and $1,500 from a chest of drawers in the bedroom. During this time period, the intruders kept urging each other to hurry because the police were coming. The men departed the home, leaving the victims handcuffed in the bedroom. The entire incident lasted approximately ten minutes, and the police arrived soon after the intruders departed.

*Id.*, slip op. at 2-3.

The petitioner filed a timely pro se petition for post-conviction relief on March 3, 2015. The post-conviction court appointed counsel, and, in October 2016, the petitioner filed an amended petition for post-conviction relief.[2]

Before a hearing on his post-conviction petition, the petitioner filed a pro se petition for writ of error coram nobis and, with the assistance of counsel, amended the coram nobis petition, alleging that the State erroneously "proceeded as though they did not have [the petitioner's] DNA sample" despite a newly-discovered 2009 report that showed that the State indeed had a DNA sample from the petitioner and had matched that sample to the DNA found on a ski mask. *Curtis Keller v. State*, No. W2019-01652-CCA-R3-ECN, slip op. at 3-4 (Tenn. Crim. App., Jackson, Jan. 27, 2021), *perm. app. denied* (Tenn. May 14, 2021) (*Keller II*). The coram nobis court summarily dismissed the petition, "conclud[ing] that the 2009 report contained the same information as the 2010 report . . . [and] was merely cumulative[] and that it would not have resulted in a different judgment." *Id.*, slip op. at 4-5. In January 2021, this court affirmed the summary dismissal of the petition for writ of error coram nobis. *Id.*, slip op. at 1. Although no order appears in the record, it appears that the post-conviction court stayed the post-conviction proceedings pending the outcome of the coram nobis petition.

While the denial of the coram nobis petition was pending appeal, the petitioner filed a second amended petition for post-conviction relief on January 9, 2020, arguing that the petitioner was deprived of the effective assistance of trial and appellate counsel and incorporating all claims from his pro se petition.

At the January 2020 evidentiary hearing, trial counsel testified that he began representing the petitioner 11 months before the March 2012 trial. He stated that he met

---

[2]    Prior to filing the amended petition, post-conviction counsel moved to withdraw, but no order denying or granting the motion is included in the record. The court later granted counsel's renewed motion to withdraw and appointed new counsel. The court then permitted that attorney to withdraw and appointed current post-conviction counsel on November 2, 2017. Present counsel is the third attorney to represent the petitioner in this post-conviction proceeding and also represented the petitioner on his coram nobis petition.

-4-

with the petitioner "on numerous occasions" and that they "had no problems communicating with each other" and "got along fine until the trial date." Before trial, counsel understood that the "gist of the State's case" was to present the testimony of the victims and of several of the co-defendants, each of whom counsel expected to testify that the petitioner was "the organizer" of the offenses. Counsel stated that he had discussed with the petitioner that a ski mask found in the get-away van contained the petitioner's DNA and was the only piece of evidence "that tied him physically to the scene."

Trial counsel acknowledged that he did not interview Doctor Qadriyyah Debnam or Tennessee Bureau of Investigation ("TBI") Special Agent Lawrence James prior to trial or subpoena the TBI's file on the DNA testing, explaining that he "didn't view the DNA attachment to the mask as a significant issue." He also stated that he had worked with Agent James in prior cases and "found him to be a pretty straight shooter" and "had no reason to doubt that [he] . . . was being straight forward about his testing" in this case. Similarly, trial counsel explained that he did not retain a DNA expert to assist in the petitioner's defense or to retest the ski mask because he "had no reason to question [the] results" of the State's testing and because he did not deem the ski mask a significant piece of evidence. He explained that the ski mask was found in the get-away van, that the State did not allege that the petitioner was ever in the van or at the crime scene, and that the absence of the petitioner's DNA on the ski mask would not have contradicted the State's theory of prosecution. Trial counsel said that he believed the outcome of the case hinged on the credibility of the co-defendant witnesses.

Trial counsel testified that he learned that in early 2009, a DNA swab was taken from the petitioner but, again, explained that he did not consider the possibility of cross-contamination of the ski mask with the petitioner's DNA swab because he "didn't have a reason to question the testing of the mask leading up to our trial." He reiterated that he did not believe that the ski mask was "pivotal to whether or not [the petitioner] was the mastermind . . . in this home invasion." He stated that he "never in a million years" would have argued to the jury that the petitioner's DNA found on the ski mask was the result of the co-mingling of evidence from a separate case in which the petitioner was charged in another home invasion because he would not "have wanted to even imply in front of the jury that [the petitioner] . . . was involved in any home invasion in any other part of the city in any other date or time." He said that "[t]he only hope we had of winning his case was" to make the co-defendants out to be "unbelievable to the jury." As to Doctor Debnam's testimony about the petitioner's DNA being a match to only two of 13 locations on the ski mask, in contradiction to Agent James's testimony that the petitioner's DNA was a match on 11 of 13 locations, trial counsel explained that "if it was something I heard her say on the witness stand and I thought it was problematic, I would've questioned her about it."

Trial counsel stated that, in light of the petitioner's being excluded from the courtroom during the trial, he did not object to the trial court's allowing a show-up identification of the petitioner by bringing the petitioner into the courtroom outside the presence of the jury so that witness Jeremy Munson could identify him. Counsel explained that he could not "think of a method that we could've done . . . where Mr. Munson wouldn't have picked [the petitioner] out." He said that he also "wanted to make it as seamless as possible" and "was trying to keep [the petitioner] from doing more harm to his case" after his yelling at the judge in front of the jury before being removed from the courtroom.

Counsel said that he mentioned the issue of the kidnapping being incidental to the robbery during his closing argument "in hopes that" at least some members of the jury would find that to be the case but explained that he did not argue the matter more strenuously because his "opinion of the testimony as it had come out at trial was that it was clearly not incidental" and because he "didn't want to draw a ton of attention to it." He further explained that he did not object to the State's calling the petitioner a "super predator" during closing argument because his "general philosophy is that I don't interrupt a prosecutor, because I never want them to interrupt me in a closing argument." He also said that had he objected to the prosecutor's use of the term "super predator," he would "essentially [be] telling the jury I'm afraid of that comment and afraid that the prosecutor has properly identified my client."

Trial counsel acknowledged that the petitioner's name was the last name listed on the original indictment and was in a different type-face than the co-defendant's names. He stated that he did not object to the indictment because even if he succeeded in having that indictment dismissed for error, the State would have simply re-indicted the petitioner, noting "[i]t's very curable." Counsel said that he knew that the State believed that the petitioner was "part of this conspiracy" and that he never doubted that the petitioner "was an intended target" for prosecution. He added that he did not see the difference in type face of the petitioner's name as a reason to challenge the indictment and that any error in the original indictment was cured with the superseding indictment.

Trial counsel testified that he did not move for a mistrial when the petitioner was removed from the courtroom after holding up a sign that said "massive corruption" and yelling at the jury because he could not "imagine [the court] at that point granting a mistrial." He explained that the court had already denied the petitioner's motion to continue the trial and that he "was quite certain" that the court viewed the petitioner's conduct "as a tactic to get a reset despite [the court's] denying him a reset." Counsel also stated that he "really didn't have a real problem with [the petitioner's] saying that the system was corrupt . . . because that's what an innocent person might say too." Counsel stated that, because the petitioner had been removed from the courtroom, jury voir dire

proceeded without the petitioner's presence, and the court instructed trial counsel to discuss jury selection with the petitioner outside of the courtroom.

Counsel stated that when he entered the room where the petitioner was seated, the petitioner "[i]mmediately . . . jumped up and punched me in the arm, and I slid out of the room and . . . [officers] came in and tackled him." He said that the petitioner yelled at him, calling him a sell-out. Counsel reported to the trial court what had happened. Counsel recalled that the trial court questioned the petitioner about the incident and instructed him that he must behave appropriately if he was to remain in the courtroom during trial and that the petitioner continued saying that trial counsel was selling him out. He also recalled that, after the court's numerous attempts to get the petitioner to agree to cooperate in the trial, the petitioner said that the trial could proceed without him, and the court had the petitioner removed from the courtroom for the duration of trial. Counsel stated that he did not object to the petitioner's removal from the courtroom because he "was worried that [the petitioner] was going to do himself some more damage in front of the jury." He continued, "So my first reaction was, okay, he's let the jury know that he thinks this process is messed up and that it's corrupt. . . . Now he's not here. He can't mess it up anymore, and I get to fight his case the way I want to legally fight his case."

Trial counsel stated that he asked the trial court for permission to withdraw from the case, telling the court that he was capable of continuing representation but was "not interested." The court denied the motion, and counsel assured the court that he was prepared for trial and would do his job. Counsel said that despite the petitioner's having punched him, he provided zealous representation. Counsel denied that he acted under a conflict of interests with the petitioner. He acknowledged that the State had led him to believe that the trial might be continued to a later date but said that he was fully prepared for trial and "had been ready for a long time."

During cross-examination, trial counsel reiterated that he had no reason to question the State's DNA testing and believed that the DNA evidence in this case "was sort of just the cherry on top for the State, because it really wasn't part of the essential elements of the crimes." He clarified that he did not seek a mistrial when the petitioner was first removed from the court room but that he did move for mistrial at the same time that he moved to withdraw from the case after the petitioner had punched him. He stated that he sustained only a bruise from the incident and was physically able to continue in the trial, providing zealous advocacy for the petitioner.

Alisa Styles, a record keeper for the Shelby County Sheriff's Office, testified that the collection of all DNA samples during an inmate's booking is recorded in a log book with the date and time the DNA was collected and the inmate's name and booking number. The jail also keeps a record from the envelope used to mail the samples to the

TBI laboratory. According to the records, Ms. Styles stated that the petitioner's DNA was collected by buccal swabs on March 16, 2009.

The petitioner testified that trial counsel met with him nine to 10 times in preparation for trial. He said that counsel provided him with some discovery materials but that there was "a whole lot of my discovery that . . . he didn't even give me that I never did see." The petitioner stated that he was not properly indicted on the original indictment, noting that he had appeared in court numerous times between February 26 and March 20, 2009, and at each appearance, the State indicated that the indictment against him had not yet been returned. At a March 20, 2009 appearance, the State had obtained an indictment against the petitioner, but the petitioner pointed out that his name appeared to have been "typed in at the last second," using a different and smaller font than that used for the co-defendants' names. The petitioner recalled that, at that same hearing, the court could not find its file for the petitioner's case. The petitioner stated that a superseding indictment issued sometime in 2010.

The petitioner stated that Doctor Debnam testified at trial that when she first entered the petitioner's DNA into CODIS, she did not find a match and that trial counsel failed to cross-examine her about that issue. The petitioner said that the March 2009 DNA sample was associated with case number 09-01311 and that, because those charges were ultimately dismissed, that DNA sample was destroyed. The petitioner asserted that the State destroyed that DNA sample as "a cover up" in this case, noting that he did not know before trial that Agent James had found a match of the DNA on the ski mask to the petitioner's DNA sample from March 2009. He also said that counsel failed to cross-examine Doctor Debnam and Agent James about the discrepancies in their results on the DNA matches. The petitioner stated that trial counsel told him that he would file a motion requesting funds for a DNA expert but that he never filed that motion. He also said that he repeatedly asked counsel to obtain an independent DNA expert. He said that trial counsel failed to investigate the DNA issue because counsel did not believe the case was going to go to trial.

The petitioner stated that the trial court acknowledged that the show-up method of identification used during Mr. Munson's testimony was suggestive but that counsel did not object to the method. He said that Mr. Munson had only ever seen him one time prior to trial.

The petitioner testified that, after he was removed from the courtroom at his trial, the court told him that he would be able to view the proceeding by video feed but that no video was provided for him. He said that when trial counsel came to discuss jury selection with him, the petitioner asked how he was expected to participate in jury selection when he could not see or hear the proceedings. He said that counsel called him a mother

f\*\*\*\*\*, "just totally disrespected me," and "walked basically on my feet didn't say excuse me." The petitioner acknowledged that, at that point, he "just swung on [counsel] for just . . . stepping on my feet, didn't say excuse me or none of that." He said that he "didn't really hit him" and that counsel put "his arm up, and I just -- a little baby hit on the arm."

The petitioner stated that he was not satisfied with the issues that appellate counsel raised, explaining that he wanted counsel to raise every issue that was raised in the motion for new trial.

In the interest of time, the post-conviction court stated that the petitioner could "supplement the record of this hearing with an affidavit from [appellate counsel] if you choose to" and with any documents not already included in the trial record. The hearing was continued to January 23, 2020, at which time appellate counsel's affidavit was exhibited to the hearing, and the parties gave their closing arguments.

In his affidavit, appellate counsel stated that it was not his "common practice to argue on appeal every issue raised in a motion for new trial," and, instead, he focused on those that he believed "were the best issues that had a chance of being overturned." He also stated that it was his practice to review all issues raised in a motion for new trial and argue any issue that he deemed to have merit. Specific to the petitioner's appeal, appellate counsel stated that he did not argue the trial court's denial of the petitioner's motion for continuance because the issue was not likely to merit relief and because the record did not "show that the outcome would have been different had the trial court granted the motion." As to the issue of the trial court's permitting the trial to continue after the petitioner was removed from the courtroom, appellate counsel stated that he did not argue the issue on appeal because "[p]revailing on the issue would have been difficult since [the petitioner] did punch his attorney." Finally, appellate counsel stated that he did not argue the trial court's denying trial counsel's motion to withdraw because he believed that "trial counsel was professional and effective at representing" the petitioner. Appellate counsel concluded, "I thought the better strategy was to omit from the appeal that the [petitioner] had attacked his trial counsel."

At the close of the hearing, the post-conviction court took the matter under advisement.

In its written order denying post-conviction relief, the post-conviction court stated that the "[p]etitioner's insistence of the fraudulent nature of the DNA evidence borders on the obsessive. He has appealed it, filed petitions for writ of error coram nobis regarding it, and generally continues to be fixated upon it." The court implicitly concluded that the petitioner failed to establish that he was prejudiced by counsel's actions as to the DNA evidence because other evidence sufficiently corroborated the testimony of two

-9-

accomplices and because the petitioner failed to establish that the potential testimony of two witnesses that he wished to call at the evidentiary hearing would have been favorable. The court concluded that the petitioner failed to establish any instance of deficient performance by counsel, stating, "The purpose of a post-conviction [proceeding] is not to second guess an attorneys [sic] strategy. In this case, [the p]etitioner refuses to accept the fact that his behavior had consequences. These consequences were not the fault of his attorney[.]"

In this timely appeal, the petitioner reasserts his argument that he was deprived of the effective assistance of trial and appellate counsel and that the post-conviction court erred by denying a continuance of the evidentiary hearing and denying the petitioner an opportunity to inspect records of the grand jury proceedings.

## I. Motion for Continuance

The petitioner argues that the post-conviction court erred by denying his motions for continuance to allow him time to have an independent DNA test of the ski mask and to allow him to re-subpoena Doctor Debnam to testify at the evidentiary hearing. The State argues that the post-conviction court properly exercised its discretion by denying the motions.

"[T]he granting or denying of a continuance is a matter which addresses itself to the sound discretion of the trial judge." *Moorehead v. State*, 409 S.W.2d 357, 358 (Tenn. 1966) (citing *Bass v. State*, 231 S.W.2d 707, 710-11 (Tenn. 1950)). An abuse of discretion is demonstrated by showing that the failure to grant a continuance denied the defendant a fair hearing or that it could be reasonably concluded that a different result would have followed had the continuance been granted. *State v. Hines*, 919 S.W.2d 573, 579 (Tenn. 1995) (citation omitted). "The burden rests upon the party seeking the continuance to show how the court's action was prejudicial. The only test is whether the defendant has been deprived of his rights and an injustice done." *State v. Goodman*, 643 S.W.2d 375, 378 (Tenn. Crim. App. 1982) (citing *Baxter v. State*, 503 S.W.2d 226, 230 (Tenn. Crim. App. 1973)). Tennessee Supreme Court Rule 28, § 8(B) provides that an evidentiary hearing "shall not be continued except by order of the court finding that unforeseeable circumstances render a continuance a manifest necessity." Tenn. Sup. Ct. R. 28, § 8(B).

At the beginning of the evidentiary hearing, the petitioner moved for a continuance to allow him time to have a ski mask tested for DNA evidence by an expert hired by the petitioner's family. The post-conviction court denied the motion, finding that because of the lengthy delays in the post-conviction proceedings, the petitioner had ample time to test the ski mask before the hearing but neglected to do so. The court further found

-10-

that, even if a new DNA test contradicted the evidence at trial, the ski mask was "inconsequential to . . . the case."

Also during the evidentiary hearing, the petitioner noted that Doctor Debnam had been subpoenaed to testify at the hearing but was not present, and the post-conviction court noted that it had no record that Doctor Debnam had been served with the subpoena. The petitioner moved for a continuance to allow time to have Doctor Debnam re-subpoenaed. The post-conviction court denied the motion, finding that Doctor Debnam's potential testimony was irrelevant to the post-conviction issues.

The post-conviction court did not abuse its discretion in denying the petitioner's motions for continuance. We agree with the post-conviction court that the ski mask was not critical to the State's case. The ski mask on which the petitioner's DNA was found was located in the get-away van. The State prosecuted the petitioner under a theory of criminal responsibility and, at no point, alleged that the petitioner wore a ski mask or was in the get-away van during the robbery. *See State v. Curtis Keller*, No. W2012-01457-CCA-R3-CD, slip op. at 15 (Tenn. Crim. App., Jackson, Nov. 6, 2013) (*Keller III*); *see also Keller I*, slip op. at 2. Consequently, even if additional testing contradicted the State's finding of the petitioner's DNA on the ski mask, the petitioner would not be entitled to post-conviction relief, and the petitioner cannot show that a continuance of the hearing would have reasonably resulted in a different outcome of the post-conviction proceeding.

Additionally, the post-conviction court did not err by finding that the petitioner had ample time to seek independent DNA testing of the ski mask prior to his January 2020 evidentiary hearing. The petitioner initiated this post-conviction proceeding in March 2015, and current counsel had represented the petitioner in this case since November 2017. Current counsel also represented the petitioner throughout his coram nobis proceedings, which case also involved a claim related to the DNA evidence on the ski mask. The petitioner's failure to seek additional DNA testing of the ski mask during the nearly five years that his post-conviction case was pending does not constitute "unforeseeable circumstances render[ing] a continuance a manifest necessity." Tenn. Sup. Ct. R. 28, § 8(B).

Similarly, the post-conviction court did not abuse its discretion by denying the petitioner's motion for continuance to allow him to re-subpoena Doctor Debnam. The post-conviction court found that Doctor Debnam's potential testimony was irrelevant to the issues raised in the post-conviction petition, and the record supports that finding. The petitioner asserts that Doctor Debnam may have testified that it was possible for the ski mask to have been contaminated before her testing it for the presence of DNA. Even if Doctor Debnam's potential testimony is as the petitioner suggests, that testimony would not result in a different outcome of the post-conviction proceeding. As stated above, the

-11-

ski mask was not critical to the State's theory of prosecution. At most, Doctor Debnam's potential testimony would cast doubt on the veracity of the State's DNA testing of the ski mask. Because this court has already determined that other evidence sufficiently corroborated the testimony of the accomplices at trial, *see Keller II*, slip op. 7-8, the petitioner cannot establish that he was prejudiced by the post-conviction court's denial of his motion for continuance to subpoena Doctor Debnam.

## *II. Motion to Inspect Grand Jury Proceedings*

Next, the petitioner contends that the trial court erred by denying his motion to inspect the records of the grand jury proceedings relative to the original indictment, arguing that his name's being listed last and typed in a smaller type-face than the co-defendants' names suggests that his "name may have been added to the indictment in a last minute effort." The State argues that the trial court properly exercised its discretion in denying the motion.

Prior to the evidentiary hearing, the petitioner moved for permission to review the grand jury materials related to his case. At the hearing, the post-conviction court denied the motion, stating that the grand jury "does not keep any materials other than [the] indictment" and that transcripts of the proceedings do not exist.

It is well-settled that grand jury proceedings are secret. Tenn. R. Crim. P. 6(k)(1) ("Every member of the grand jury shall keep secret the proceedings of that body and the testimony given before it, except as provided in Rule 6(k)(2)"); *see also*, T.C.A. § 40-12-209(a)(3); *State v. Caruthers*, 35 S.W.3d 516, 533 (Tenn. 2000). Certain records of grand jury proceedings may be disclosed only in limited circumstances. *See* Tenn. R. Crim. P. 6(k)(2) (providing as an exception to the rule of secrecy that "[t]he court may require a grand juror to reveal the testimony of a grand jury witness . . . to ascertain whether the grand jury testimony is consistent with that given by the witness before the court[,] or . . . to disclose the grand jury testimony of any witness charged with perjury"); T.C.A. § 40-12-209(b) (permitting the disclosure of grand jury materials to "[t]he district attorney general for use in the performance of the district attorney general's duty" and to "[g]overnment personnel . . . as those personnel are deemed necessary by the district attorney general to assist . . . in the performance of the district attorney general's duties"); *id* § 40-12-210 (permitting the "[d]isclosure of grand jury documents and proceedings" when "[d]irected by a court preliminarily to or in connection with a judicial proceeding," "[d]isclosure is made by the district attorney general to another grand jury," or "[p]ermitted by a court upon motion of the defendant showing grounds exist for a motion to dismiss the indictment because of matters occurring before the grand jury").

Furthermore, although "[t]he district attorney general, the witness under examination, an interpreter when needed and, for the purpose of taking the evidence, a stenographer may be present while the investigative grand jury is in session," "no person other than jurors and alternates may be present while the grand jury is deliberating or voting," T.C.A. § 40-12-207, and no stenographic record is made of the proceedings while the grand jury is deliberating and voting, *id.* § 40-12-208(a).

Because no record is kept of grand jury deliberations, it is unclear what materials the petitioner believes would reveal the intention of the grand jury to charge the petitioner in the original indictment. Furthermore, because the circumstances permitting the disclosure of secret grand jury records are not present here, even if grand jury records exist which support the petitioner's claim, the petitioner is not entitled to those records.

### III. Ineffective Assistance of Counsel

Finally, the petitioner alleges that he was deprived of the effective assistance of trial and appellate counsel, arguing numerous instances of alleged deficient performance. The State contends that the petitioner has failed to establish any instance of deficient performance.

We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

Before a petitioner will be granted post-conviction relief based upon a claim of ineffective assistance of counsel, the record must affirmatively establish, via facts clearly and convincingly established by the petitioner, that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and that counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a

probability sufficient to undermine confidence in the outcome." *Id.* at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When considering a claim of ineffective assistance of counsel, a reviewing court "begins with the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all significant decisions," *Kendrick v. State*, 454 S.W.3d 450, 458 (Tenn. 2015) (citation omitted), and "[t]he petitioner bears the burden of overcoming this presumption," *id.* (citations omitted). We will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

## A. Failure to Challenge State's DNA Evidence

First, the petitioner argues that trial counsel performed deficiently by failing to seek independent DNA testing of a ski mask. Relatedly, the petitioner asserts that trial counsel performed deficiently by failing to interview Doctor Debnam prior to trial and to adequately cross-examine her about her testing the ski mask for DNA.

Trial counsel's decision to not challenge the State's DNA evidence is precisely the sort of strategic decision that we will not second-guess on post-conviction. *See Adkins*, 911 S.W.2d at 347. Trial counsel testified that he did not deem the State's DNA evidence to be critical to this case, and, consequently, he did not perform deficiently by focusing his efforts on other theories of defense. Furthermore, even if additional DNA testing of the ski mask contradicted the State's reports, it would not have changed the outcome at trial. As we explained above, because the ski mask was found in the get-away van and the petitioner was never alleged to have been in the van or to have worn a ski mask, the absence of his DNA on the mask would do nothing to contradict the State's theory of prosecution. Consequently, trial counsel did not perform deficiently by failing to seek independent DNA testing of the ski mask or to interview and question Doctor Debnam about her testing of the ski mask.

## B. Failure to Object to State's Closing Argument

Next, the petitioner argues that trial counsel performed deficiently by failing

to object to and move for a mistrial following the State's referring to the petitioner as a "super predator" during its closing argument.

During the State's closing argument, the prosecutor made the following statements about the petitioner and his co-defendants:

> This ain't drug deals on the corner. This isn't an ATM robbery. This isn't even a murder, even, when they get mad at somebody. These guys, this is like a military operation. If criminals are predators, these are the super predators. . . . we have all of them, we have the team, super predators, all stone cold caught and all stone cold guilty.

After describing the theory of criminal responsibility, the prosecutor said, "And so he is guilty of this, on all seventeen counts of the crimes, of being a predator, of being a super predator."

Here, we easily conclude that the prosecutor's referring to the petitioner as a "super predator" in closing argument was inappropriate. *See State v. Hartman*, 42 S.W.3d 44, 60 n.14 (Tenn. 2001) (stating that "the prosecutor erred during closing argument by referring to . . . the defendant as a 'predator'"); *State v. Cauthern*, 967 S.W.2d 726, 737 (Tenn. 1998) (stating that the State's use of the epithet "evil one" to characterize the defendant was "improper and potentially appealed to the bias and passion of the jury" (citations omitted)); *State v. Richard Shawn O'Rourke*, No. M2017-00375-CCA-R3-CD, slip op. at 10 (Tenn. Crim. App., Nashville, Sept. 18, 2018) (concluding that a prosecutor's referring to a defendant as a "sexual predator" during closing argument was improper, "likely inflamed the passion and prejudice of the jury," and "call[ed] upon the jury to find the [d]efendant guilty to prevent him from reoffending"); *State v. Thomas Dee Huskey*, No. E1999-00438-CCA-R3-CD, slip op. at 136 (Tenn. Crim. App., Knoxville, June 28, 2002) ("We believe that describing the defendant as a human predator was derogatory and improper." (citations omitted)).

Trial counsel's decision not to object to the prosecutor's statements, however, was strategic, and consequently, trial counsel did not perform deficiently in this matter. Trial counsel testified that he did not object to the prosecutor's statements because he did not want to draw the jury's attention to the potentially damaging characterization. Indeed, in the petitioner's closing argument, trial counsel attempted to mitigate any prejudice created by the State's argument by arguing that the State's closing argument "was dramatic and it was emotional," reminding the jury that they were to "try this case without passion, without prejudice" and asking the jury to "disregard" the State's argument. This was a reasonable and strategic decision, and we will not now second-guess counsel's

-15-

strategy.

### C. Failure to Challenge Original Indictment

Next, the petitioner contends that trial counsel failed "to investigate whether the [p]etitioner was actually indicted by the grand jury" in the original indictment.

As we explained above, the petitioner is not entitled to the secret records of the grand jury proceedings—assuming such records exist—and, consequently, trial counsel did not perform deficiently by failing to seek grand jury records in order to challenge the validity of the indictment. Trial counsel explained that he did not challenge the original indictment because he did not believe that the different type-face used for the petitioner's name rendered the indictment invalid and because he believed that the State could easily cure any error. Furthermore, even if the petitioner could prove that he was not properly indicted on the original indictment, he went to trial on a superseding indictment, and the original indictment was dismissed.

### D. Failure to Object to Exclusion from Trial

Next, the petitioner argues that trial counsel should have objected to the trial court's ruling that the petitioner waived his right to be present during his trial and that counsel should have moved for a mistrial when the petitioner was removed from the courtroom.

It is without question that a criminal defendant has a fundamental right to be present during his trial. *State v. Mosley*, 200 S.W.3d 624, 631 (Tenn. Crim. App. 2005) ("A defendant has a fundamental right under both the federal and state constitutions to be present during his trial.") (citations omitted); *see also* Tenn. R. Crim. P. 43(a); *State v. Muse*, 967 S.W.2d 764, 766 (Tenn. 1998)). The defendant may waive that right, however, by disruptive behavior. Tenn. R. Crim. P. 43(b) ("The further progress of the trial . . . shall not be prevented and the defendant shall be considered to have waived the right to be present whenever a defendant, initially present . . . [a]fter being warned by the court that disruptive conduct will result in removal from the courtroom, persists in conduct justifying exclusion from the courtroom.").

Here, the record indicates that after the trial court denied the petitioner's motion for a continuance—outside the presence of the venire—the petitioner said, "You can have the damn trial without me even being here." After the jury venire entered the courtroom, the petitioner held up a sign that read, "massive corruption within the courts." The petitioner held the sign so that all potential jurors could see it. The trial court twice asked the petitioner to lower the sign, but the petitioner "flipped it around so that everyone

could see it." At that point, the trial court asked the jury to leave the courtroom. As the jury venire began leaving the courtroom, the following exchange occurred:

> THE [PETITIONER]: It's the truth. They don't want you to know the truth.
>
> THE COURT: Be quiet, Mr. Keller. Don't say another word.
>
> THE [PETITIONER]: You all are forcing me to go to trial, it's the truth.
>
> THE COURT: Take him out, please, take him out.
>
> THE [PETITIONER]: (Indiscernible) You don't want them to hear the truth, that's the truth.

The petitioner was removed from the courtroom before the jury venire had fully vacated the courtroom.

Once the jury venire was outside of the courtroom, the trial court had the petitioner brought back in and informed the petitioner of his right to be present at trial but warned him that, unless the petitioner would "promise . . . that you will behave yourself in front of the jury," he would waive that right and be excluded from trial. When the trial court allowed the petitioner the opportunity to discuss with trial counsel whether he would behave and remain in the courtroom, the petitioner said, "This man ain't even representing me." He also said, "I ain't got nothing to talk to him about." The trial court again gave the petitioner an opportunity to discuss the matter with trial counsel, but the petitioner continued to argue with the court that he could not have a fair trial if he was not present and would not be permitted to "have my witnesses." After much back-and-forth, the petitioner again said, "Well, you can have the trial without me because this ain't no fair trial," at which point, the trial court found that the petitioner had waived his right to be present at trial and ordered the petitioner removed from the courtroom.

After jury voir dire, the trial court took a recess to allow trial counsel time to discuss jury selection with the petitioner. Trial counsel returned to the courtroom and, outside the presence of the jury, explained to the trial court that the petitioner had assaulted him. The court determined that the petitioner did "not want to cooperate in having input in his trial" and asked counsel if he was able to continue to represent the petitioner "to the best of your ability without his input?" Counsel stated that he could continue representing the petitioner but told the court that he may have a conflict of interests because he chose

-17-

not to subpoena a witness that the petitioner wished to call. Counsel stated, "[I]f the [c]ourt doesn't feel it's a strong enough conflict, I can go forward." Counsel also noted that his "defense would be somewhat hampered by not being able to talk to [the petitioner]" but that he could "do what I've prepared to do." The trial court stated that it was up to counsel's professional discretion—with the input of the petitioner—whether to call witnesses. The trial court stated that it was satisfied that the petitioner's physical assault on trial counsel did not raise a conflict such that counsel could no longer represent the petitioner.

At that point, trial counsel moved for a mistrial, stating that because the petitioner had "tried to attack me outside the courtroom here, I do think that it's incumbent upon me to at least ask you to at this point declare a mistrial . . . and reset the case and maybe appoint him another lawyer." The trial court noted that the petitioner's case had been pending since March 2009 and that "conflicting ideas" between the petitioner and trial counsel were not grounds to continue the trial or to appoint new counsel. Upon counsel's assurance that he could continue to represent the petitioner, the court implicitly denied the motion, and the trial proceeded with the petitioner excluded from the courtroom.

It is clear from the record that the trial court, as required by Tennessee Rule of Criminal Procedure 43(b), warned the petitioner numerous times that his continued disruptive behavior would result in his waiving his right to be present at trial. *See* Tenn. R. Crim. P. 43(b). The court also gave the petitioner multiple opportunities to agree to conduct himself appropriately and remain in the courtroom. Furthermore, trial counsel's testimony established that he did not object to the petitioner's exclusion from trial for tactical reasons. Counsel stated that he did not deem the petitioner's outburst about "massive corruption" to be harmful to his defense "because that's what an innocent person might say too" and that he believed that additional outbursts by the petitioner could be detrimental to his defense. Counsel also testified that he did not believe that the trial court would have granted a mistrial in light of its previous denial of his motion for continuance. Because the trial court implicitly denied a motion for a mistrial upon ensuring that trial counsel was willing and able to proceed without conflict, the petitioner has not shown that the trial court would have granted a mistrial had counsel made such a motion as soon as the petitioner was removed from the courtroom. In consequence, because the petitioner has failed to establish that he would have been successful on a motion for mistrial and because counsel's decision not to object to his exclusion was strategic, this claim lacks merit.

*E. Failure to Object to Show-Up Identification*

Related to his exclusion from trial, the petitioner argues that trial counsel should have objected to the trial court's allowing a "show-up" identification by State witness Jeremy Munson.

A show-up identification is a "one-on-one confrontation" in which "a single person is presented as a suspect to a viewing eyewitness." *State v. Thomas*, 780 S.W.2d 379, 381 n.1 (quoting *United States v. Sanders,* 547 F.2d 1037, 1040 (8th Cir. 1976)). Generally, this method of identification occurs when the police arrange an observation of the defendant by the victim. *State v. Dixon,* 656 S.W.2d 49, 51 (Tenn. Crim. App. 1983). A show-up as a form of identification of a defendant is, by its nature, inherently suggestive. *Thomas,* 780 S.W.2d at 381. For that reason, the use of show-ups to establish the identification of a person suspected of committing a criminal offense has been repeatedly condemned absent special circumstances. *Id*. One such circumstance exists when "there are imperative circumstances which necessitate a show[-]up." *Id.*

Here, because the petitioner was excluded from the courtroom, the trial court had the petitioner brought to the courtroom outside the presence of the jury for Mr. Munson to make an in-court identification. *See Keller III*, slip op. at 7 n.4. After the petitioner was removed from the courtroom, the trial court informed the jury that Mr. Munson had positively identified the petitioner as the person known as "Big Daddy," who briefly entered the hotel room where Mr. Munson and the other co-defendants were preparing for the robbery.

Trial counsel testified that he did not object to the trial court's using this method of in-court identification at trial because he had no reason to doubt that Mr. Munson would identify the petitioner regardless of the method of identification used. The record established that Mr. Munson saw the petitioner when the petitioner arrived at the hotel room where the co-defendants were preparing for the robbery. The petitioner has failed to establish that Mr. Munson was influenced by the suggestive nature of the in-court identification or that Mr. Munson would not have identified him had some other method been used. Furthermore, Mr. Munson's in-court identification of the petitioner was not the only evidence identifying the petitioner as a participant in the conspiracy; Curtis Hayes, who had known the petitioner for at least a year prior to the robbery, identified the petitioner from a photograph as one of the men who told him of the plan and invited him to participate in the robbery. *Keller III*, slip op. at 8. Therefore, even if Mr. Munson's identification of the petitioner was unduly suggestive, the petitioner has failed to establish that he was prejudiced by counsel's failure to object in light of Mr. Hayes's identification. Consequently, this claim lacks merit.

### F. Conflict of Interests

Next, the petitioner argues that trial counsel performed deficiently because he represented the petitioner despite a conflict of interests. Specifically, the petitioner contends that the breakdown in communication between the petitioner and counsel and the

petitioner's punching counsel created an actual conflict of interests that negatively affected counsel's representation.

Ineffective assistance of counsel may result if counsel's performance is affected by a conflict of interests. *Strickland,* 466 U.S. at 692. A conflict of interests exists when "an attorney is placed in a position of divided loyalties." *McCullough v. State*, 144 S.W.3d 382, 385 (Tenn. Crim. App. 2003) (citing *State v. Culbreath*, 30, S.W.3d 309, 312 (Tenn. 2000)); *see also* Tenn. Sup. Ct. R. 8, RPC 1.7(2) ("A concurrent conflict of interest exists if . . . there is a significant risk that the representation of one or more clients will be materially limited by . . . a personal interest of the lawyer.").

Here, the petitioner has failed to establish that trial counsel represented him while laboring under a conflict of interests. Neither a breakdown in communication nor a physical altercation between an attorney and a client necessarily gives rise to a conflict of interests. While it is true that the petitioner punched counsel when counsel tried to discuss jury selection with him, the trial court questioned counsel about his ability to continue representing the petitioner, and counsel assured the court that he was able to proceed and to fulfill his ethical duties in representing the petitioner. The only conflict that trial counsel raised to the trial court was that the petitioner disagreed with counsel's decision not to call a certain witness, and the trial court found that a difference of opinion in a defense strategy did not give rise to a conflict in this case.

The trial court considered whether a conflict of interests existed and determined that it did not. Additionally, counsel moved for a mistrial and suggested that the petitioner be provided a new attorney, but the trial court denied that motion. Because the record indicates that trial counsel alerted the trial court to a potential conflict and moved to withdraw and that the trial court found no conflict existed and denied the motion, the petitioner cannot establish that counsel performed deficiently in this matter.

### G. Failure to Argue Certain Issues on Appeal

Next, the petitioner argues that appellate counsel performed deficiently by failing to argue on appeal certain issues raised in the motion for new trial. Specifically, he contends that he could have been successful on appeal had counsel argued that the trial court erred by excluding him from trial and by denying trial counsel's motion to withdraw from representation.

It is well-established that appellate counsel is not "required to raise every conceivable issue on appeal." *Carpenter v. State*, 126 S.W.3d 879, 887 (Tenn. 2004) (citing *King v. State*, 989 S.W.2d 319, 334 (Tenn. 1999); *Campbell v. State*, 904 S.W.2d 594, 596-97 (Tenn. 1995)). Generally, "[t]he determination of which issues to raise on

-20-

appeal is . . . within appellate counsel's sound discretion[,] . . . [and] appellate counsel's professional judgment with regard to which issues will best serve the appellant on appeal should be given considerable deference." *Carpenter*, 126 S.W.3d at 887 (citations omitted). To succeed on a claim of ineffective assistance of appellate counsel for failure to raise certain issues, a petitioner "must show that th[e] omission was 'so serious as to fall below an objective standard of "reasonableness under prevailing professional norms."'" *Id.* (quoting *Dean v. State,* 59 S.W.3d 663, 667 (Tenn. 2001)).

Here, the petitioner has failed to establish that appellate counsel performed deficiently. As we have already stated, the petitioner has not shown that he would have been likely to succeed on an objection to his removal from the courtroom or on a motion for the appointment of new trial counsel. Moreover, appellate counsel stated in his affidavit that his decision not to pursue all issues raised in the motion for new trial was strategic. Accordingly, appellate counsel did not perform deficiently by failing to raise these issues on appeal.

## H. Cumulative Error

Finally, the petitioner argues that the cumulative effect of counsel's errors prejudiced the petitioner such that he should be granted post-conviction relief. Because the petitioner has failed to establish a single instance of deficient performance or error, the cumulative error doctrine does not afford him relief.

Accordingly, the judgment of the post-conviction court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE